IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 14-mj-5021-KGS |
| | ) | |
| vs. | ) | Count 1: 18 U.S.C. §§ 2, 1349 |
| | ) | |
| SATISH KUMAR GUDARU, | ) | |
| PRAKASH KANYADARA, and | ) | |
| CAROL NELSON, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## AFFIDAVIT

I, SEAN KILCOYNE, being duly sworn, depose and state as follows:

## I.    Introduction

1.    This Affidavit is being presented for the purpose of establishing probable cause to support a Criminal Complaint against, and Arrest Warrants for, SATISH KUMAR GUDARU, PRAKASH KANYADARA, and CAROL NELSON, for conspiracy to commit mail and wire fraud.

2.    I have been employed as a Special Agent of the United States Department of Labor, Office of Inspector General - Office of Labor Racketeering and Fraud Investigations ("DOL-OIG") for approximately nineteen years. I am presently the Assistant Special Agent in Charge. I have worked on numerous federal criminal investigations with other agents, police officers, and law enforcement personnel who have extensive criminal investigative experience and training. As a federal agent, I am authorized to investigate violations of law of the United States and am a law enforcement

officer with the authority to execute warrants issued under the authority of the United States.

3. As will be explained below, I believe sufficient evidence exists to support a probable cause finding that SATISH KUMAR GUDARU ("GUDARU"), PRAKASH KANYADARA ("KANYADARA"), and CAROL NELSON ("NELSON") have committed offenses against the United States, namely:

a. knowingly and intentionally conspiring and agreeing with each other and with other persons, both known and unknown, to use the mails in executing a scheme to defraud, in violation of 18 U.S.C. § 1341; and to use interstate wires in executing a scheme to defraud, in violation of 18 U.S.C. § 1343; all in violation of 18 U.S.C. § 1349.

4. Because this Affidavit is submitted for the limited purpose of establishing probable cause in support of a criminal complaint against and the issuance of arrest warrants for GUDARU, KANYADARA, and NELSON, it does not contain all of the facts known by me with regard to the investigation and the individuals and events described herein. All witness interviews and conversations referenced in this affidavit are described in summary, non-verbatim form; such summaries do not constitute, and do not purport to be, detailed recitations of all statements made by all of the participants in the interviews and/or conversations. All dates referenced herein are approximate.

## II.    Background

5. The H1B Specialty (Professional) Workers Program ("H1B Visa Program") is a Visa program administered by the United States Department of Labor ("DOL") through the Employment and Training Administration ("ETA"). The H1B Visa Program

allows businesses in the United States, like ZEN INFOTECH, to temporarily employ foreign workers with specialized or technical expertise in a particular field, such as accounting, engineering, or computer science.

6.   Before hiring a foreign worker, the employer must first obtain approval from the Department of Labor by filing a Labor Condition Application (LCA), ETA Form 9035E.   In the Labor Condition Application, the employer represents that it intends to employ a specified number of foreign workers for specific positions for a particular period of time.  The employer also makes representations regarding the rate of pay, work location, and whether the position is full-time.   The employer also agrees to pay the foreign workers for non-productive time.

7.   The employer must attest that the representations made in the Labor Condition Application are true and accurate, and the Application form itself provides a warning that false representations may lead to criminal prosecution.  Except in limited circumstances, the Labor Condition Application must be filed electronically.   Upon filing, the employer is required by regulation to print and sign a copy, then maintain the signed copy in its files.

8.   After the Department of Labor has approved the Labor Condition Application, the employer must then obtain permission from the U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services (UCIS), to hire a specific individual.  This approval is obtained by filing a Petition for a Non-immigrant Worker, Form I-129 ("I-129 Petition"), and paying certain fees.   In this I-129 Petition, the employer provides biographical information regarding the specific foreign worker to be employed.  The employer also provides much of the same information that is in the Labor

Condition Application, including job title, the specific type of position for which the foreign worker is hired, work location, pay rate, dates of intended employment, and whether the position is full-time. The I-129 Petition is signed under penalty of perjury, and the employer must certify that the information submitted is true and correct.

9. Once the I-129 Petition is approved, the foreign worker can apply for a visa at a U.S. Consulate or Embassy overseas. If the foreign worker is already legally in the United States, his or her immigration status can be changed automatically. Once an H1B visa is issued or adjustment of immigration status occurs, the foreign worker possesses lawful non-immigrant status, meaning that the foreign worker is entitled to stay in the United States. The foreign worker may reside in the United States and work for the employer until the H1B visa expires, or until his or her government-approved employment with the company ends, whichever occurs first. The foreign worker may not immigrate, or permanently reside, in the United States under an H1B visa.

10. For a foreign worker entering the United States from abroad, the employer must start paying the foreign worker once he or she enters into employment or within 30 days of admission to the United States, whichever is sooner. For a foreign worker already in the United States, the employer must begin paying the worker upon the start of employment or within 60 days of the I-129 Petition's approval, whichever is sooner.

11. If the foreign worker is dismissed from employment before the H1B visa expires, the employer must send notice to U.S. Citizenship and Immigration Services and pay for the foreign worker to return to his or her native country.

### III. The Investigation to Date

12.     This investigation has included multiple interviews of ZEN INFOTECH employees, analysis of I-129/LCA applications, and the analysis of the operating account of ZEN INFOTECH. It revealed that GUDARU, KANYADARA, and NELSON and its agents regularly caused non-immigrant workers to enter or remain in the United States using H1B specialty worker visas when ZEN INFOTECH did not have positions readily available to employ the workers.  This is in violation of DOL rules and regulations, and contrary to the sworn statements made on the LCAs and H1B visa applications.

13.     This investigation has revealed that when positions were not readily available for non-immigrant workers, the non-immigrant workers were caused to be "benched," meaning the workers were not employed and not paid until work became available.  In most instances "benched" employees were allowed to live in a guest house with other "benched" H1B non-immigrant workers.

14.     As a result of the H1B non-immigrant workers not having employment immediately available to them, the workers were not paid by the conspirators, in violation of the Labor Condition Application and DOL rules and regulations.  As part of the H1B application process, ZEN INFOTECH stated it understood that employees must have immediate employment available upon arriving in the United States, and be paid at least the prevailing wage.

15.     GUDARU, KANYADARA, and NELSON caused prospective H1B workers to be recruited, hired, and marketed by ZEN INFOTECH.  When an I-129/LCA was filed by ZEN INFOTECH, it stated the H1B non-immigrant worker would be paid a minimum

salary, when in fact, the non-immigrant workers were paid at a lower rate than was required by the I-129/LCA.

16.    Agents of ZEN INFOTECH regularly caused Form I-129 petitions and Labor Condition Applications to be submitted.   The petitions and applications falsely stated there was immediate employment available for the H1B immigrant worker, and the immigrant worker would be paid according to the Condition of the Labor Condition Application, which are false statements.   The following are details related to non-immigrant H1B applicants with ZEN INFOTECH who have been interviewed during the course of this investigation.

17.    During the course of the scheme, ZEN INFOTECH filed approximately 977 Labor Condition Applications with the Employment and Training Administration, forms which were certified and approved. This data was taken directly from the Employment and Training Administration website.

18.     Following an administrative investigation, the DOL's Wage and Hour Division identified 36 current and former H1B non-immigrant employees of ZEN INFOTECH who were "benched" from July 18, 2008 until February 28, 2010 and are owed approximately $672,889.00 in back wages.

**IV.    Zen Infotech**

19.    According to the Kansas Secretary of State's website, ZEN INFOTECH, LLC ("ZEN INFOTECH") is a computer staffing business.   ZEN INFOTECH was registered as a Limited Liability Company with the Kansas Secretary of State on November 24, 1999, listing the management and sole member as GUDARU, 7575 W. 106TH Street #20, Overland Park, Kansas 66212.

20.    According to the Kansas Secretary of State's website, GUDARU serves as ZEN INFOTECH's Chief Executive Officer and Neelima Gudaru, his wife, serves as ZEN INFOTECH's President.

21.    KANYADARA is listed as the Senior Marketing Manager USA on ZEN INFOTECH's organizational chart provided to the U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services.

22.    NELSON is listed as the Human Resources Manager on ZEN INFOTECH's organizational chart.

23.    Eleven former and current ZEN INFOTECH employees have been interviewed.    These employees interacted with GUDARU, KANYADARA, and NELSON.  Based on these interactions, the eleven employees reported that GUDARU, as the owner/CEO of ZEN INFOTECH, oversaw KANYADARA and NELSON; KANYADARA oversaw ZEN INFOTECH operations, including H1B recruitment and coordination, at the direction of GUDARU, even when GUDARU was in India; and NELSON was responsible for H1B recruitment and the human resources department at ZEN INFOTECH.

24.    Based on interviews of ZEN INFOTECH employees, GUDARU, KANYADARA, NELSON, and others recruited foreign workers with computer expertise who wanted to work in the United States.  GUDARU, KANYADARA, and NELSON sponsored the workers' H1B visas, representing that the foreign workers would be employed at ZEN INFOTECH's headquarters in Shawnee, Kansas.  But, in truth and in fact, the foreign workers were not employed in Shawnee, Kansas; instead, the defendants required the foreign workers to provide computer related services to third-party

companies located elsewhere. Additionally, contrary to the representations the defendants made to both the workers and the government, the defendants paid the workers only when the workers were placed, or the worker found employment on their own, with a third-party company, and only if and after the third-party company paid ZEN INFOTECH for the workers' services.

25. This scheme provided the defendants with a labor pool of inexpensive, skilled foreign workers who could be used on an "as needed" basis. The scheme was profitable because it required minimal overhead and ZEN INFOTECH could charge significant hourly rates for a computer consultant's services. Accordingly, the defendants earned a substantial profit margin when a foreign worker was assigned to a project and incurred few costs when a foreign worker was without billable work.

26. This scheme is known as "benching." Benching is defined as "workers who are in nonproductive status due to a decision by the employer, such as lack of work." The defendants, through ZEN INFOTECH, actively recruited H1B workers, "benched" them, and often required workers to find their own employment.

27. The H1B program requires the H1B foreign worker to perform services for the petitioning company, *i.e.,* ZEN INFOTECH. ZEN INFOTECH's "benching" scheme was facilitated by the defendants' use of the company as a "placement" or "staffing" company, instead of as a direct employer. Regulations require that ZEN INFOTECH inform the government if the workers were assigned to a different location than ZEN INFOTECH's address. But, in most cases, ZEN INFOTECH did not so inform the government. Moreover, as an intermediary company, ZEN INFOTECH claimed that jobs existed with third-party companies when, in fact, ZEN INFOTECH had not yet secured

contracts with these companies; thus, ZEN INFOTECH filed false documents with the Department of Labor, requesting H1B visas for foreign workers to be employed in positions that did not exist.

28. In furtherance of their visa fraud scheme and conspiracy, GUDARU, KANYADARA, and NELSON submitted, and caused to be submitted false and fraudulent Labor Condition Applications (ETA Form 9035E) and I-129 Petitions for at least the employees discussed below, whom were either benched, did not work, or worked in locations other than Shawnee, Kansas. The Labor Condition Applications and I-129 Petitions were false in at least the following respects:

a. The Applications and Petitions represented that the foreign workers would be employed at ZEN INFOTECH, in existing jobs, when, in truth and in fact, as GUDARU, KANYADARA, and NELSON well knew, ZEN INFOTECH had no such existing jobs, and would often require the foreign workers to find work with other companies.

b. The Applications and Petitions represented that the foreign workers would be employed at ZEN INFOTECH in Shawnee, Kansas, when, in truth and in fact, as GUDARU, KANYADARA, and NELSON placed the ZEN INFOTECH foreign workers at other companies outside of the Kansas city metropolitan area.

c. The Applications and Petitions represented that the foreign workers would be paid a certain yearly salary, when, in truth and in fact, GUDARU, KANYADARA, and NELSON failed to pay the salary represented to the foreign workers or the Department of Labor.

d. The Applications and Petitions represented that the foreign workers would be employed in full-time positions, when, in truth and in fact, as GUDARU, KANYADARA, and NELSON well knew, ZEN INFOTECH did not have full-time positions for the foreign workers.

e. The Applications and Petitions represented that the foreign workers would be paid in accordance with the H1B visa program, when, in truth and in fact, GUDARU, KANYADARA, and NELSON benched the employees for periods of time without payment.

**Foreign National Employee Mahesh Kumar Gangineni (Labor Condition Application I-04105-1050865 and I-129 Petition)**

29.     On or about April 14, 2004, GUDARU, on behalf of ZEN INFOTECH, submitted a Labor Condition Application for Gangineni by a wire transmittal sent from Kansas to California.   The information in the Application falsely stated that Gangineni was to be employed at ZEN INFOTECH and would receive an annual salary of $50,000.00.

30.     On or about April 16, 2004, ZEN INFOTECH mailed an I-129 Petition for Gangineni to the Department of Justice, Immigration and Naturalization Service in Lincoln, Nebraska (now known as United States Citizenship and Immigration Services (UCIS)).  The I-129 was submitted in order for Gangineni to receive an extension of stay or change of employer on his H1B visa status.  The information provided in the petition was similarly false as Gangineni was never actually employed by ZEN INFOTECH as a computer programmer – the reason he was given H1B status originally – and in fact worked non-computer related jobs the entire time he was in the United States.   The Petition further included false information related to Gangineni's work history and computer programming skills.

**Foreign National Employee Yogomaya Maharana (Labor Condition Application I-09085-4836501)**

31.  On or about March 26, 2009, ZEN INFOTECH submitted a Labor Condition Application for Maharana by a wire transmittal sent from Kansas to California.

32.   On or about March 30, 2009, ZEN INFOTECH submitted an I-129 Petition for Maharana, sending it by Federal Express.

33.    On both the I-129 Petition and the Labor Condition Application, ZEN INFOTECH indicated that Maharana would be employed in Shawnee, Kansas, at an annual salary of $60,000.

34.    NELSON, for and on behalf of ZEN INFOTECH, signed the I-129 Petition and the Labor Condition Application for Maharana, attesting that the statements in the Petition and Application were true and accurate, and certifying under penalty of perjury that the Petition, as well as the supporting evidence and attachments, were true and correct.

35.    Department of Homeland Security databases revealed U.S. Citizenship and Immigration Services approved ZEN INFOTECH's I-129 Petition for Maharana on May 20, 2009.

36.    When she arrived at ZEN INFOTECH, Maharana worked on internal projects for a few months. From in or about April 2009, through in or about August 2010, ZEN INFOTECH periodically benched Maharana, failed to pay her an annual salary of $60,000, and sent her to work in Atlanta, Georgia.

37.    Maharana, a former ZEN INFOTECH H1B employee, was interviewed on July 12, 2013.  Maharana reported, and the Kansas Department of Labor (KDOL) wage records confirm, that she was "benched" from April 2009 until June 2009.  Additionally, the KDOL wage records reported Maharana made $20,000.00 from July through December of 2009, rather than the $30,000 she should have made, according to the I-129 Petition and the Labor Condition Application ZEN INFOTECH submitted.

38.    Maharana worked and lived in an unauthorized location (Atlanta, Georgia) during all or part of the time period of January 2010 to November 2010, in violation of

the terms and Condition of the H1B visa, and contrary to the representations ZEN INFOTECH made to the Department of Labor in the Application and Petition submitted for Maharana. ZEN INFOTECH failed to report wages paid to Maharana in April-August 2010. The quarterly wage reports provided by the Department of Labor showed ZEN INFOTECH did not report wages for Maharana for the 2nd and 3rd quarter of 2010. However, the file for the I-129 filed by ITAAS, Inc. (Maharana's employer and petitioner after ZEN INFOTECH) contained copies of ZEN INFOTECH pay statements showing wages paid to Maharana.

39. Maharana reported that NELSON recruited her, at the direction of KANYADARA and GUDARU. Prior to her employment and during her recruitment by ZEN INFOTECH, if Maharana had any employment-related questions or issues, she dealt with NELSON and KANYADARA. Based on her observations and dealings with ZEN INFOTECH, Maharana reported that GUDARU owned ZEN INFOTECH and KANYADARA answered directly to GUDARU.

**Foreign National Employee Jagannath Varkatam (Labor Condition Application I-09089-4868195**

40. On or about March 30, 2009, ZEN INFOTECH submitted a Labor Condition Application for Varkatam by a wire transmittal sent from Kansas to California.

41. On or about April 1, 2009, ZEN INFOTECH submitted an I-129 Petition for Varkatam, sending it by United States mail.

42. In both the I-129 Petition and the Labor Condition Application, ZEN INFOTECH indicated that Varkatam would be employed in Shawnee, Kansas, at an annual salary of $60,000.

43.     NELSON, for and on behalf of ZEN INFOTECH, signed the I-129 Petition and the Labor Condition Application for Varkatam, attesting that the statements in the Petition and Application were true and accurate, and certifying under penalty of perjury that the Petition, as well as the supporting evidence and attachments, were true and correct.

44.     Department of Homeland Security databases revealed U.S. Citizenship and Immigration Services approved ZEN INFOTECH's I-129 Petition for Varkatam on June 17, 2009.

45.     From in or about October 2009, through in or about September 2012, ZEN INFOTECH periodically benched Varkatam, failed to pay him an annual salary of $60,000, and sent him to work in Omaha, Nebraska.

46.     Varkatam was interviewed on July 12, 2013.   KANYADARA recruited Varkatam to work at ZEN INFOTECH and coordinated the filing of Varkatam's Labor Condition Application and his I-129. Varkatam reported, and the Kansas Department of Labor (KDOL) wage records confirm, that he was "benched" for a period of approximately two and a half (2 ½) months starting in October 2009.   During the benching, Varkatam worked on ZEN INFOTECH internal projects.   Additionally, the KDOL wage records indicate that Varkatam made $7,000.00 during October through December 2009, and not the $15,000 he should have made, based on the representations in both the I-129 Petition and the Labor Condition Application.

47.     Varkatam worked and lived in an unauthorized location (Omaha, Nebraska) during all or part of the time period of January 2010 to September 2012, in violation of the terms and Condition of the H1B visa, and contrary to the representations ZEN

INFOTECH made to the Department of Labor in the Application and Petition submitted for Varkatam.

48.    According to Varkatam's observations, GUDARU as ZEN INFOTECH'S President, oversaw all operations and was the final decision maker.

**Foreign National Employee Rahul Vaidya (Labor Condition Application I-09090-4872045**

49.    On or about March 31, 2009, ZEN INFOTECH submitted a Labor Condition Application for Vaidya by a wire transmittal sent from Kansas to California.

50.    On or about April 6, 2009, ZEN INFOTECH  submitted an I-129 Petition for Vaidya, sending it by Federal Express.

51.    In both the I-129 Petition and the Labor Condition Application, ZEN INFOTECH indicated that Vaidya would be employed in Shawnee, Kansas, at an annual salary of $60,000.

52.    NELSON, for and on behalf of ZEN INFOTECH, signed the I-129 Petition and the Labor Condition Application for Vaidya, attesting that the statements in the Petition and Application were true and accurate, and certifying under penalty of perjury that the Petition, as well as the supporting evidence and attachments, were true and correct.

53.    Department of Homeland Security databases revealed U.S. Citizenship and Immigration Services approved ZEN INFOTECH's I-129 Petition for Vaidya on June 17, 2009.

54.    Upon Vaidya's arrival in the United States on January 23, 2010, ZEN INFOTECH benched him for approximately four months, from January 23, 2010, until sometime in May 2010, as confirmed by a review of ZEN INFOTECH's operating

account. ZEN INFOTECH failed to pay Vaidya an annual salary of $60,000, and sent him to work in Atlanta, Georgia. The KDOL wage records for Vaidya indicate he made $12,501.00 during April through June of 2010, rather than the $15,000 he should have made.

55. The I-129 Petition and Labor Condition Application submitted by ZEN INFOTECH indicated the place of employment was Shawnee, Kansas, but Vaidya reported working in Atlanta, Georgia. Therefore, Vaidya worked and lived in an unauthorized location during all or part of the time period of May 2010 through Janaury 2011, in violation of the terms and Condition of the H1B visa, and contrary to the representations ZEN INFOTECH made to the Department of Labor in the Application and Petition submitted for Vaidya.

56. Vaidya was interviewed on July 16, 2013. According to Vaidya, GUDARU, KANYADARA, and NELSON recruited Vaidya to work under a H1B visa, but once he arrived in the United States, ZEN INFOTECH did not have a project waiting for him, and he was required to find one. Vaidya stated GUDARU and KANYADARA coordinated the filing of the Labor Condition Application and his I-129 Petition.

57. According to Vaidya's observations, it was common practice at ZEN INFOTECH to "bench" employees. Vaidya stated GUDARU, KANYADARA and NELSON coordinated the benching of employees.

**Former Employee Ana Lopez**

58. On March 26, 2014, your affiant, along with DOL Special Agent Jay Roberts interviewed Ana Lopez. Lopez stated that from March 15, 2012 until May 31, 2013, she was employed by ZENINFOTECH and largely performed ministerial duties. Lopez

described ZENINFOTECH as a staffing agency. According to Lopez, NELSON was the human resources manager and KANYADARA was the H1B recruiter. After two months on the job Lopez was promoted to office manager even though she saw no other employees other than NELSON and KANYADARA.

59. Lopez stated that following her promotion KANYADARA had her assist him with paperwork. She stated that the files she worked on came at the direction of GUDARU through KANYADARA. Lopez further stated that she observed KANYADARA forge NELSON's name on ETA-9035s and I-129 petitions.

60. Lopez stated that she signed over one hundred I-129s and ETA 9035s and was responsible for mailing the I-129s.

61. Lopez related that in her time at ZENINFOTECH she never recalled seeing any H1B worker or any H1B worker perform work at ZENINFOTECH.

62. Lopez further stated that none of the desktop computers at ZENINFOTECH worked or were even set up to a network. When Lopez inquired of NELSON as to why the computers were not networked, NELSON stated that the computers were there to give the appearance that ZENINFOTECH had workstations for its employees should the government ever show up.

63. Lopez added that NELSON told her that KANYADARA was using false educational degrees and diplomas to place in the H1B packets and supporting documentation. Lopez maintained that KANYADARA was responsible for all of the H1B files at ZENINFOTECH.

64. Lopez was shown an electronically filed ETA-9035 (LCA) for case number I-200-13072-030920 and stated that both the electronic signature and wet signature on the

form were not hers. ZEN INFOTECH is required to keep a hard copy of the electronically filed LCA in their public access files and to have a wet signature affixed to section K(5) of the LCA. This document was signed on March 28, 2013, nine days after the LCA was formally filed with the Labor Department. She stated that she believed KANYADARA had both electronically signed her name to the form as well as having affixed her wet signature to the form on March 28, 2013. She was also shown the I-129 form, to which the LCA is attached when mailed, for the same case and she again stated that her wet signature on the I-129 was not affixed by her. She believed that KANYADARA had forged her name to that document as well. This document was signed on March 27, 2013, mailed, and received by UCIS in California on April 26, 2013.

## V. Conclusion

65. Based on the above information, I respectfully submit that probable cause exists for the criminal complaint against and arrest warrants for GUDARU, KANYADARA, and NELSON for violating Title 18, United States Code, Sections 2 and 1349.

FURTHER AFFIANT SAYETH NOT

s/Sean P. Kilcoyne
_____
SEAN KILCOYNE
Assistant Special Agent in Charge
U.S. Department of Labor
Office of Inspector General

Subscribed and sworn before me
this _18th_ day of April, 2014

s/K. Gary Sebelius
_____
K. GARY SEBELIUS
United States Magistrate Judge